**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DARWIN NATIONAL ASSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. 3:14-2417** |
| | : | |
| **v.** | : | |
| | : | **(JUDGE MANNION)** |
| **LUZERNE COUNTY TRANSPORTATION AUTHORITY, STANLEY J. STRELISH and ROBB A. HENDERSON,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

Presently before the court are: (1) a motion for summary judgment filed on behalf of the plaintiff, Darwin National Assurance Company, now known as Allied World Specialty Insurance Company, (Doc. 26); (2) a cross-motion for summary judgment filed on behalf of the defendant Robb A. Henderson ("Henderson"), (Doc. 28); and (3) a cross-motion for summary judgment filed on behalf of the defendant Stanley J. Strelish ("Strelish"), (Doc. 31). This case involves a determination of the rights and obligations of the plaintiff insurance company stemming from a policy issued to the defendant Luzerne County Transportation Authority ("LCTA"), where the Pennsylvania Office of Attorney General ("OAG") initiated two separate criminal proceedings against Strelish, former Executive Director of LCTA, and Henderson, former Operations Manager of LCTA, for an alleged conspiracy to defraud the Pennsylvania

Department of Transportation ("PennDOT"). For the reasons discussed below, the plaintiff's motion for summary judgment will be **GRANTED** in part and **DENIED** in part; Henderson's cross-motion for summary judgment will be **DENIED**; and Strelish's cross-motion for summary judgment is **DENIED**.

## I.     BACKGROUND

### A.     Factual Background

In June 2014, a Pennsylvania statewide investigating grand jury issued a Presentment containing written findings of fact and a recommendation that criminal charges be filed against defendants Strelish and Henderson (collectively, the "Individual Defendants"). (Doc. 27-3). The Individual Defendants allegedly conspired to defraud PennDOT by intentionally submitting inflated and false county bus ridership data to PennDOT to obtain excess grant monies. Strelish held the position of Executive Director since 2007 and had overall responsibility for LCTA. Henderson held the position of Operations Manager since 2008 and supervised all LCTA bus drivers.

The following is a brief description of the grand jury's findings. The court notes that the Individual Defendants contest the plaintiff's characterization of the grand jury's findings in its statement of material facts, maintaining that the Presentment speaks for itself. In describing the Presentment, the court is not

making any findings of fact with respect to the allegations in the Presentment but is merely paraphrasing the grand jury's findings. In particular, the grand jury found that the largest source of income for LCTA is an annual grant issued by PennDOT pursuant to 74 Pa.C.S. §1513, which provides in part that senior citizens can ride for free on public transportation authority vehicles. Each authority must, however, record all such rides and submit the data to PennDOT for reimbursement in the annual grant. The PennDOT grants are issued on a fiscal year basis, and the amount thereof is based on a complex formula that includes the reported number of senior citizen bus riders.

The grand jury findings further state that the source of the senior citizen ridership data is initially LCTA bus drivers, who record each senior rider by pushing a particular button on the bus's fare box, which the driver uses to accept fares and record the type of riders. In this way, LCTA bus drivers can record more senior riders than those who actually boarded the bus, and LCTA employees call this practice "hitting the button." (Doc. 27-3 at 4).[1] According to the Presentment, "Multiple LCTA drivers and former drivers testified that they intentionally 'hit the button' to falsely inflate the number of senior citizen riders on their bus as directed by STRELISH and HENDERSON. The drivers who testified about hitting the button uniformly stated that they received no

---

[1] All citations to page numbers of documents in this docket refer to the ECF document page number.

personal direct benefit from the practice, but were compelled by threats from LCTA management that, if senior ridership numbers were not high, the financial condition of LCTA would be affected and there could be driver layoffs or worse." Id.

Shortly after defendants Strelish and Henderson assumed their respective positions at LCTA, the grand jury found that LCTA reported dramatic increases in senior citizen riders to PennDOT and that, on multiple occasions between 2007 and 2013, Strelish signed certifications to PennDOT verifying that the number of senior citizen riders for specific fiscal years between 2005 and 2013 was true and correct. Further, the grand jury's findings state that PennDOT later reclaimed a "total of $3,158,826 from LCTA for the period of FY 2008-2009 through FY 2013-2014, which included a 25% administrative penalty." Id. at 15 (footnote omitted).

On September 23, 2014, the government filed Criminal Informations against Strelish and Henderson, respectively, in Pennsylvania state court.[2] The Criminal Informations allege that Strelish and Henderson conspired to create false bus ridership data, which Strelish then submitted to PennDot to obtain excess grant monies, and the monies were then used to pay various

_____

[2]See Commonwealth of Pennsylvania v. Stanley J. Strelish, No. CP-22-CR-4802-2014 (Court of Common Pleas of Dauphin County, Pennsylvania); Commonwealth of Pennsylvania v. Robb A. Henderson, No. CP-22-CR-4801-2014 (Court of Common Pleas of Dauphin County, Pennsylvania).

operating expenses of LCTA, including the salaries of the Individual Defendants. Strelish was charged with the following crimes: (1) six counts of dealing in the proceeds of illegal activity; (2) six counts of theft by deception; (3) four counts of criminal conspiracy to commit thef t by deception; (4) seven counts of tampering with public records; (5) six counts of unsworn falsification to authorities; (6) seven counts of false swearing; and (7) six counts of obstructing administration of a governmental function. (Doc. 27-4). Henderson was charged with eleven (11) counts of criminal conspiracy and four (4) counts of aiding consummation of a crime. (Doc. 27-5).

The Individual Defendants tendered the Criminal Informations to the plaintiff insurer under the Public Officials Liability and Employment Practices Liability Insurance Policy numbered 0202-3238, which the plaintiff issued to LCTA for the period January 1, 2014 to January 1, 2015. (Doc. 27-6). On September 3, 2015, Strelish executed a document titled, "Guilty Plea Agreement and Colloquy of Defendant Stanley Strelish" ("Plea Agreement"), in his criminal proceeding to several counts of tampering with public records in violation of 18 Pa. C.S. §4911(a)(1), a felony of the third degree.[3] (Doc. 50-3). At a hearing on September 8, 2015, the Court of Common Pleas of Dauphin County accepted Strelish's plea and sentenced Strelish to five years

---

[3]An offense under 18 Pa. C.S. §4911(a)(1) is a misdemeanor of the second degree unless the intent of the actor is to defraud or injure anyone, in which case the offense is a felony of the third degree.

of probation and ordered him to pay a $5,000 fine. (Doc. 50-4).

**B.    Procedural History**

**1.    Pleadings**

The plaintiff insurance company filed an action seeking a declaratory judgment against the defendants on December 19, 2014. (Doc. 1). On January 27, 2015, Henderson filed an answer with affirmative defenses and asserted a counterclaim against the plaintiff for bad faith pursuant to 42 Pa.C.S.A. §8371. (Doc. 8). The next day, on January 28, 2015, Strelish filed an answer with affirmative defenses and also asserted a counterclaim against the plaintiff for bad faith pursuant to 42 Pa.C.S.A. §8371. (Doc. 10). The plaintiff subsequently filed an answer with affirmative defenses to Strelish's and Henderson's counterclaims on February 12, 2015. (Doc. 15, Doc. 16). On February 23, 2015, LCTA filed an answer with affirmative defenses and asserted a counterclaim against the plaintiff for breach of contract. (Doc. 17). On March 16, 2015, the plaintiff filed an answer with affirmative defenses to LCTA's counterclaim. (Doc. 23).

**2.    Plaintiff's Motion for Summary Judgment**

On June 29, 2015, the plaintiff filed a motion for summary judgment

6

along with a supporting brief and a statement of material facts, (Doc. 26, Doc. 27, Doc. 26-3). On July 20, 2015, Strelish filed a brief in opposition to the plaintiff's motion for summary judgment, as well as a response to the plaintiff's statement of material facts. (Doc. 36, Doc. 37). On July 27, 2015, Henderson filed a brief in opposition to the plaintiff's motion for summary judgment, as well as a response to the plaintiff's statement of material facts. (Doc. 39, Doc. 40). On August 3, 2015, the plaintiff filed a brief in reply to Strelish's opposition brief. (Doc. 43). On August 10, 2015, the plaintiff filed a brief in reply to Henderson's opposition brief. (Doc. 45). On December 21, 2015, following Strelish's guilty plea, the plaintiff filed a supplemental brief in support of its motion for summary judgment without response from the defendants. (Doc. 50).

### 3.  Defendant Strelish's Cross-motion for Summary Judgment

On June 30, 2015, Strelish filed a cross-motion for summary judgment and a concise statement of material facts, (Doc. 31, Doc. 32), followed by a supporting brief on July 13, 2015, (Doc. 34). On August 3, 2015, the plaintiff filed a brief in opposition to Strelish's cross-motion for summary judgment, as well as a counterstatement of material facts. (Doc. 41, Doc. 42). On August 14, 2015, Strelish filed a reply brief in support of his cross-motion for summary judgment. (Doc. 47).

### 4.    Defendant Henderson's Cross-motion for Summary Judgment

On June 30, 2015, Henderson filed a cross-motion for summary judgment and a concise statement of material facts, (Doc. 28, Doc. 29), followed by a supporting brief on July 23, 2015, (Doc. 38). On August 10, 2015, the plaintiff filed a brief in opposition to Henderson's cross-motion for summary judgment that included a statement of facts. (Doc. 46).[4] On August 24, 2015, Henderson filed a reply brief in support of his cross-motion for summary judgment. (Doc. 48).

### C.    The Insurance Policy

The Public Officials Liability and Employment Practices Liability Insurance Policy[5] contains, in relevant part, the following provisions regarding coverage for the liability of public officials (emphasis in the original,

---

[4]The plaintiff did not respond to Henderson's concise statement of material facts as required by LR 56.1. Noting this deficiency, the court still declines to deem as admitted all the material facts contained in Henderson's concise statement of material facts. The plaintiff included a statement of facts in its brief opposing Henderson's cross-motion for summary judgment, and submitted a statement of material facts in support of its motion for summary judgment as well as a counterstatement to Strelish's concise statement of material facts, which is largely similar to Henderson's concise statement of material facts.

[5]Doc. 27-6.

representing defined terms under the insurance contract):

DECLARATIONS

ITEM 3.    LIMITS OF LIABILITY

(A)    PUBLIC OFFICIALS LIABILITY

$1,000,000    Insurer's maximum Limit of Liability for all Loss from each Claim under INSURING AGREEMENT I.A(1);

(B) NON-MONETARY COVERAGE — DEFENSE ONLY

(1) $100,000    Insurer's maximum Limit of Liability for all Defense Expenses from each Claim under INSURING AGREEMENT I.A(2);

(2) $100,000    Insurer's maximum Limit of Liability for all Defense Expenses from all Claims under INSURING AGREEMENT I.A(2);
. . .

I.    INSURING AGREEMENTS; ADDITIONAL COVERAGES

A.    Public Officials Liability

(1)    Public Officials Wrongful Acts Coverage

The **Insurer** will pay on behalf of any **Insured**, excess of the Retention and subject to the Limits of Liability set forth in the Declarations, **Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** first made against an **Insured** during the **Policy Period** or any applicable Extended Reporting Period, for a **Public Officials Wrongful Act** which occurs on or after the **Retroactive Date** and before the end of the **Policy Period**.

The **Insurer** will have the right and duty to defend a **Claim** against an **Insured** for a **Public Officials Wrongful Act** which is covered under this INSURING AGREEMENT A(I),

9

even if the allegations of such **Claim** are groundless, false or fraudulent.

(2)    Claims Seeking Non-Monetary Relief, Defense Only Coverage

The **Insurer** will reimburse the **Insured**, excess of the Retention and subject to the Limits of Liability set forth in the Declarations, **Defense Expenses** incurred in connection with a **Claim** exclusively seeking, and at all times remaining a **Claim** exclusively seeking, **Non-Monetary Relief**, which is first made against any **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and arising out of **Public Officials Wrongful Acts** which occurs on or after the **Retroactive Date** and before the end of the **Policy Period**.

. . .

## II.   DEFINITIONS

D.    "**Claim**" means:

(1)    any written demand for monetary damages or **Non-Monetary Relief**;

. . .

(4)    any criminal proceeding which is commenced by the return of an indictment or similar document;

. . .

G.    "**Defense Expenses**" means:

(1)    reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

. . .

(3)    any fees, costs, charges or expenses incurred by the **Insured** at the specific written request of the **Insurer** to assist the **Insurer** in the investigation, defense or appeal of a **Claim**.

. . .

N.    "**Loss**" means damages, pre-judgment interest, post-judgment

interest, front pay and back pay, judgments, settlements, punitive or exemplary damages were insurable under applicable law, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**.

Loss will not include:
(1) **Defense Expenses**;
(2) **Non-Monetary Relief**;
(4) fines, taxes, penalties;

. . .

P.    "**Non-Monetary Relief**" means relief or redress in any form other than compensatory or monetary damages, including: the costs of complying with any injunctive, declaratory or equitable relief, remedy or order; the costs of compliance with the Americans with Disabilities Act or any similar provisions of federal, state or local statutory or common law; and any award of claimant's or plaintiff's attorneys fees or costs, whether or not provided for by statute, but only with respect to **Claims** seeking such non-monetary relief.

. . .

Y.    "**Related Claims**" means all **Claims** for **Wrongful Acts** based upon, arising out of resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances situations, transactions or events, whether related logically, causally or in any other way.

. . .

III.   EXCLUSIONS

A.    The **Insurer** shall not pay **Loss**, but shall only pay **Defense Expenses**, from any **Claim** brought about or contributed to in fact by:

(1)    any deliberate misconduct or deliberate dishonest, fraudulent, criminal or malicious act, error, or omission by any **Insured**;

(2)    any willful violation by any Insured of any law, statute, ordinance, rule or regulation; or

11

(3)     any **Insured** gaining any profit, remuneration or advantage to which such **Insured** is not legally entitled.

The applicability of Exclusions A(1), A(2), and A(3) to any specific **Insured** may be determined by an admission of such **Insured**, a finding, or final adjudication in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**. If any specific **Insured** in fact engaged in the conduct specified in Exclusions A(l), A(2) or A(3), such **Insured** shall reimburse the **Insurer** for any **Defense Expenses** advanced to or on behalf of such **Insured**.

. . .

IV.    CONDITIONS

(7)     **Defense   Expenses**  payable   under INSURING AGREEMENT I.A(2) are part of and not in addition to the applicable Limits of Liability set forth in ITEM 3 of the Declarations, and payment of such **Defense Expenses** by the **Insurer** will reduce such Limits of Liability.

(8)     In the event that any **Claim** for which coverage is provided under INSURING AGREEMENT I.A(2) subsequently becomes a **Claim** for both monetary and **Non-Monetary Relief** for which coverage is provided under INSURING AGREEMENT I.A(1) or I.B, such **Claim** shall become subject to the increased Retention and the Limit of Liability applicable under INSURING AGREEMENT I.A(l) or I.B. **Defense Expenses** incurred in connection with such **Claim** shall be applied against the applicable Retention, and shall reduce the applicable Limit of Liability, under either INSURING AGREEMENT I.A(l) or I.B.

. . .

(10)    **Related Claims** will be deemed a single **Claim**, and only one "each Claim" Limit of Liability, and only one Retention, will apply.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery

[including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. See Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could

find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir.2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23; see also Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## III.   DISCUSSION

Prior to defendant Strelish's guilty plea, the parties agreed that Strelish and Henderson are Insured because they were employees of LCTA,[6] but the parties strongly conflicted over whether Insuring Agreement I.A(1) or I.A(2) applies. The plaintiff previously agreed to provide coverage to the Individual

---

[6]"Employees" are included in the definition of "Insured" in the insurance contract. (Doc. 27-6 at 10).

Defendants under Insuring Agreement I.A(2) and had tendered $50,000 to Strelish and $26,241.31 to Henderson (recently commencing issuance of the payment of $23,758.69 to bring the total reimbursement for Henderson's Defense Expenses to $50,000). (Doc. 50-2 at 2). However, the plaintiff insurer refused to provide coverage under Insuring Agreement I.A(1), which requires the plaintiff to reimburse for Loss up to a maximum liability of $1,000,000 for each claim - without limit to expenditure of Defenses Expenses - excess of a $5,000 retention for each claim. Whereas, Insuring Agreement I.A(2) requires the plaintiff only to reimburse a claim for incurred Defense Expenses up to a maximum limit of $100,000, excess of a $5,000 retention for each claim.

The insurer argued that the claims exclusively seek "Non-Monetary Relief," as defined in the contract, and hence Insuring Agreement I.A(2) applies to the Individual Defendants' claims. Further, the insurer argued that the respective criminal proceedings against Strelish and Henderson constitute "Related Claims" under the insurance contract, and as such, the maximum limit of liability of $100,000 should apply to the consolidated claims. The Individual Defendants maintain that Insuring Agreement I.A(l), rather than I.A(2), applies because a conviction for the charged offense of 18 Pa. C.S. §5111, "Dealing in proceeds of unlawful activities," requires a defendant to compensate the victim through mandatory restitution, which they contend constitutes "Loss" under the contract. Therefore, defendants Strelish and Henderson argue that their claims are not Related Claims, and that they are

each entitled to the $1,000,000 limit of liability for Loss with no limit to the expenditure of Defenses Expenses under Insuring Agreement I.A(1).

In the midst of summary judgment motion practice, defendant Strelish pled guilty to tampering with public records. The plaintiff thus filed a supplemental brief and now argues that Strelish's guilty plea triggered the exclusion in Section III.A of the insurance contract, and as a consequence, coverage is barred with respect to Strelish's criminal proceeding. The plaintiff further argues that Strelish must refund the plaintiff the $50,000 in defense costs previously advanced to him.

The Section III.A exclusion provides an enumerated list of prohibited acts whereby the insurer "shall not pay **Loss**, but shall only pay **Defense Expenses**, from any **Claim** brought about or contributed to in fact by" such acts. (Doc. 27-6 at 16). Section III.A continues, "If any specific Insured in fact engaged in the conduct specified in Exclusions A(l), A(2) or A(3), such **Insured** shall reimburse the **Insurer** for any **Defense Expenses** advanced to or on behalf of such **Insured**." Id.

In the Plea Agreement, Strelish admitted to the following:

> For five years between 2007 and 2012, as the Executive Director of the Luzerne County Transportation Authority, I submitted false bus ridership data to the Pennsylvania Department of Transportation, which data I certified as accurate, in order to obtain greater grant monies than that to which the Authority was entitled. Both the certifications and data submissions were records or documents received and kept for the information of PennDOT, a state government agency.

16

(Doc. 50-3 at 1). The acts in Strelish's admission fit within exclusion A(1) of the list, which is "any deliberate misconduct or deliberate dishonest, fraudulent, criminal or malicious act, error, or omission by any **Insured**." (Doc. 27-6 at 16). Strelish pled guilty to a felony of the third degree and admitted to committing a criminal act. As such, the court finds that the plaintiff has fulfilled its burden in proving that the Section III.A(1) exclusion applies to Strelish's claim. Strelish is not covered under the insurance contract, and he is obligated to reimburse the plaintiff for the $50,000 in Defense Expenses the plaintiff advanced to him. The court therefore holds that Strelish's cross-motion for summary judgment is moot. The sole remaining issue is the plaintiff's scope of obligations to defendant Henderson.

### A.    Interpretation of Insurance Contract

Determining the scope of coverage involves interpretation of the insurance contract, which is a question of law for the court to decide. Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997), as amended (Aug. 28, 1997); Hunyady v. Aetna Life & Casualty, 578 A.2d 1312, 1313 (Pa. 1990). Under Pennsylvania's choice of law principles, the court looks to the law of Pennsylvania, the state where the insurance policy was contracted and delivered, for guidance in construing the policy. McMillan v. State Mut. Life Assur. Co. of Am., 922 F.2d 1073, 1074-75 (3d Cir. 1990). Regarding the

interpretation of an insurance contract, the Third Circuit stated:

> In determining whether a contract is ambiguous, the court must examine the questionable term or language in the context of the entire policy and decide whether the contract is "reasonably susceptible of different constructions and capable of being understood in more than one sense." Gamble Farm Inn, Inc. v. Selective Ins. Co., 440 Pa.Super. 501, 656 A.2d 142, 143-44 (1995) (quoting Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 201, 519 A.2d 385, 390 (1986)). Where a provision of a policy is ambiguous, the provision should be construed in favor of the insured and against the insurer, the drafter of the agreement. Standard Venetian Blind, 503 Pa. at 305, 469 A.2d at 566. If, however, the terms of the policy are clear and unambiguous, the general rule in Pennsylvania is to give effect to the plain language of the agreement. Bensalem Tp. v. International Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir.1994).

Reliance, 121 F.3d at 900-01. The initial burden of establishing coverage under an insurance policy rests with the insured, however the insurer bears the burden of establishing the applicability of an exclusion under an insurance policy. Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 206 (3d Cir. 2001).

The crux of the disagreement on coverage involves an interpretation of "Non-Monetary Relief," as defined in the insurance contract. Defendant Henderson was accused of violating 18 Pa. C.S. §5111, "Dealing in proceeds of unlawful activities." In determining the sentence to be imposed, the court must select one or more alternatives including, but not limited to, a determination of guilt without further penalty, a fine, probation, and confinement. 42 Pa. C.S. §9721(a). In addition to these alternatives, 42 Pa.

18

C.S. §9721(c), "Mandatory restitution," provides that "the court shall order the defendant to compensate the victim of his criminal conduct for the damage or injury that he sustained." Citing §9721(c), Henderson asserts that a conviction under §5111 requires the court to impose restitution.

Defendant Henderson argues that because a conviction under §5111 mandates a sentence including restitution, his claim is not "exclusively seeking Non-Monetary Relief." (Doc. 27-6 at 6). He contends that the carefully crafted definition of "Loss" explicitly excludes "fines, taxes, penalties" and yet does not exclude restitution. Id. at 11. Thus, restitution must fall under the definition of "Loss." Henderson maintains that his claim constitutes a mix of monetary and non-monetary relief, and therefore Insuring Agreement I.A(1) applies to his claim pursuant to the condition set forth in Section IV.A(8) of the contract. Section IV.A(8) of the contract states, in relevant part, that in the event any claim covered by Insuring Agreement I.A(2) "subsequently becomes a claim for both monetary and Non-Monetary Relief," such claim shall be subject to the increased limit of liability under Insuring Agreement I.A(I). Id. at 21. Moreover, Henderson asserts that his interpretation of the contract is reinforced by a review of the contract as a whole. The strict parameters for coverage under Insuring Agreement I.A(2) ("exclusively seeking Non-Monetary Relief") in conjunction with the condition under Section IV.A(8) described above demonstrates that Section I.A(2) was intended to be

19

narrowly applied.

The court disagrees with Henderson's interpretation of the contract. With respect to all charged offenses other than dealing in proceeds of unlawful activities, Loss excludes as "fines" and "penalties" the sentencing alternatives including monetary payments upon conviction of these charges. Defendant Henderson grasps onto the punishment of restitution and maintains that it does not fall under the plain meaning of "Non-Monetary Relief." Non-Monetary Relief is defined as "relief or redress in any form other than compensatory or monetary damages . . . ." Id. at 12. Neither damages nor restitution is defined in the insurance policy. The court's purpose in interpreting an insurance contract is to "ascertain the intent of the parties as manifested by the terms used in the written insurance policy." Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 290 (Pa. 2007). Given that the insurance contract's definition of "Non-Monetary Relief" explicitly includes monetary items, such as attorney's fees, the court would be hard-pressed to consider that the parties intended for "Non-Monetary Relief" to exclude all monetary items. Further, although "Loss" lists out specific exclusions, any item not excluded does not mean *ipso facto* that it is included.

The plaintiff disputes that Henderson's criminal proceeding seeks restitution at all. Citing Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 896 (2006), the plaintiff contends

that the court is to look to the allegations in the Criminal Information in assessing whether the claim seeks restitution. Henderson's Criminal Information does not state a claim for relief. Similar to the Federal Rules of Criminal Procedure, the Pennsylvania Rules of Criminal Procedure do not require a claim for relief in criminal complaints or Informations. Pa. R. Crim. P. Rules 504, 560; see also Fed. R. Crim. P. 3. The plaintiff thus argues that the criminal proceeding does not seek restitution, but the plaintiff neglects to cite any authority involving criminal prosecutions in support of the proposition that the court shall analyze the allegations in the criminal complaint to determine an insurer's obligations. Examining the complaint does not provide a clear answer to whether the claim seeks restitution.

Looking at what actually transpired, the government agreed in Strelish's Plea Agreement that it "will not seek restitution from Defendant." (Doc. 50-3 at 2). Moreover, the Court of Common Pleas did not impose restitution on Strelish at sentencing. The plaintiff reasoned that restitution was not sought or imposed because LCTA already returned the excess grant monies to PennDOT and paid PennDOT a 25% administrative penalty on top of that. Thus, because Strelish's criminal proceeding ultimately did not seek restitution, it is highly unlikely that the government would seek restitution in Henderson's criminal proceeding if Henderson were later convicted.

Regardless of whether Henderson's claim seeks restitution,

21

significantly, the Superior Court of Pennsylvania has held that Pennsylvania public policy forbids insurance coverage for an order of restitution imposed pursuant to a criminal conviction. Brethren Mut. Ins. Co. v. McKernan, 961 A.2d 205, 206 (Pa. Super. 2008). The Superior Court described the sound reasoning behind this policy:

> [A]n order of criminal restitution is imposed for its effect on the defendant. It is meant to help rehabilitate a convict by impressing upon him, in some degree, the scope of the damage inflicted by his criminal conduct. The proposition that a third party insures against the ordered criminal restitution would defeat this purpose entirely. In fact, it could increase the likelihood of criminal conduct by transferring the responsibility of a restitution order, *i.e.*, the ramifications of criminal conduct, to an insurance provider. Any rehabilitative effect, not to mention deterrence, would thus be negligible.

Id. at 208. The plaintiff argues that restitution for criminal acts is uninsurable under Pennsylvania public policy, and thus Henderson should not be able to obtain greater insurance coverage based on restitution. The court is not aware of any ruling from the state's highest court on this issue, therefore the court must make a prediction about how the Pennsylvania Supreme Court would rule. McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 661-62 (3d Cir. 1980).

Analogously, Pennsylvania's public policy precludes insurance coverage for punitive damages against a tortfeasor who is personally guilty of outrageous and wanton conduct. Wolfe v. Allstate Prop. & Cas. Ins. Co., 790 F.3d 487, 493 (3d Cir. 2015). As the Third Circuit stated, the primary purpose

22

of Pennsylvania's longstanding rule centers not on the victim but on the defendant, and efforts to punish and deter the defendant from perpetrating such acts. See Wolfe, 790 F.3d at 493 (citing Esmond v. Liscio, 224 A.2d 793, 799 (Pa. Super. 1966)); see also Stevenson v. Econ. Bank of Ambridge, 413 Pa. 442, 454, 197 A.2d 721, 727 (1964) ("Such damages [punitive damages] are only awarded to punish outrageous conduct"). Similar to the Superior Court's reasoning with respect to restitution in Brethren, the Third Circuit stated that "to permit insurance against the sanction of punitive damages would be to permit such offenders to purchase a freedom of misconduct altogether inconsistent with the theory of civil punishment which such damages represent." Id.

The court finds that, if presented with the matter before us, the Pennsylvania Supreme Court would reject the insured's petition for greater insurance coverage based on restitution arising out of criminal acts, especially here, where the alleged conduct involved an intentional criminal conspiracy to commit fraud. The rationale behind Pennsylvania's public policy precluding insurance coverage for punitive damages is the same rationale behind precluding insurance coverage for restitution arising out of criminal acts. To allow coverage for restitution arising out of criminal acts would effectively permit the purchase of a "freedom of misconduct" that is inconsistent with the purpose of restitution, which is to impress upon the offender the gravity of his

23

actions. Henderson urges the court to rule in his favor by using restitution as the key to greater coverage under Insuring Agreement I.A(1), where restitution for criminal fraudulent acts itself would not be covered. Giving this key to the defendant would be an absurd result. The court holds that the plaintiff insurer's obligations to Henderson is governed by Insuring Agreement I.A(2), and the court will grant the plaintiff's motion and deny Henderson's cross-motion for summary judgment on the issue of which insuring agreement applies to Henderson's claim under the insurance contract.[7]

## B.    Limit of Liability

As discussed above, in the midst of summary judgment motion practice, Strelish pled guilty to tampering with public records. Prior to Strelish's conviction, in July 2015, the parties signed a stipulation regarding how the limit of liability of Insuring Agreement I.A(2) would be allocated between

---

[7]Henderson offered an additional argument in support of coverage under Insuring Agreement I.A(1) based on the exclusion in Section III.A. Perhaps his weakest argument, Henderson asserts that the Section III.A exclusion illustrates the coverage owed for a claim arising out of a criminal act. While the exclusion contemplates a situation where the insurer is not required to pay "Loss" but must pay "Defense Expenses," the exclusion does not operate to grant the Individual Defendants coverage. By contrast, the exclusion operates to exclude coverage. After stating that the insurer is not required to pay Loss but must pay Defense Expenses, the provision then states that if the insured engaged in any one of the prohibited acts in the enumerated list, the insured must reimburse the insurer for such Defense Expenses.

Strelish and Henderson in the event that the court concludes that Insuring Agreement I.A(2) and not I.A(1) governs the plaintiff's obligations to the defendants. The stipulation, titled "Stipulation of All Parties," was filed with the court on August 3, 2015. (Doc. 44). Specifically, the stipulation states:

> In the event that the District Court in the above-captioned matter concludes that Insuring Agreement I.A(2) of the Policy, rather than Insuring Agreement I.A(1) of the Policy, governs Allied World's [the plaintiff] obligations to Strelish and Henderson with respect to the Underlying Actions, the $100,000.00 Limit of Liability of Insuring Agreement I.A(2) will be allocated between Strelish and Henderson in equal shares, such that Strelish and Henderson would each be entitled to a potential maximum reimbursement of Defense Expenses, as that phrase is defined in the Policy, of $50,000.00, subject to all of the terms, conditions, limitations and exclusions of the Policy.

Id. at 3. The stipulation further states that the agreement is without prejudice to the rights of the defendants to continue to assert that Insuring Agreement I.A(1) applies and the respective criminal proceedings against Strelish and Henderson do not constitute "Related Claims" within the meaning of the insurance contract.

Absent Strelish's guilty plea and assuming that the court found Insuring Agreement I.A(2) to apply to both of the Individual Defendants' claims, the $100,000 Limit of Liability under Insuring Agreement I.A(2) would be allocated between the two Individual Defendants in equal shares in accordance with the stipulation signed by all the parties. Strelish and Henderson would each be entitled to a potential maximum reimbursement of Defense Expenses of

25

$50,000. In light of Strelish's conviction and the resulting exclusion of his claim, in its supplemental brief, the plaintiff now states that the Section III.A exclusion bars all coverage for Strelish's criminal proceeding, and that Strelish's previous argument in his cross-motion for summary judgment regarding which insuring agreement applies "is now moot." (Doc. 50 at 5).

The court agrees with the plaintiff's conclusion that the Section III.A exclusion bars Strelish from receiving coverage for his criminal proceeding, thereby rendering his cross-motion for summary judgment moot. The court, however, disagrees with the plaintiff's additional conclusion that the plaintiff is obligated to reimburse defendant Henderson for his additional Defense Expenses in his criminal proceeding, beyond the $50,000 it has already paid him, *only* to the extent the plaintiff collects the $50,000 due and owing from defendant Strelish. (Doc. 50 at 9). In other words, the plaintiff asserts that it must pay Defense Expenses to Henderson up to the maximum Limit of Liability of $100,000, less any of the $50,000 Strelish reimburses to it.

The stipulation is triggered by two requisite events: 1) the court concludes that Insuring Agreement I.A(2) governs the plaintiff's obligations to Strelish with respect to Strelish's criminal proceeding; and 2) the court concludes that Insuring Agreement I.A(2) governs the plaintiff's obligations to Henderson with respect to Henderson's criminal proceeding. Failing satisfaction of the first requirement, the stipulation does not apply. The court

declines to find that Insuring Agreement I.A(2) applies to Strelish with respect to his criminal proceeding because the issue is moot. The court has found, and the plaintiff agrees, that defendant Strelish is not covered under the insurance policy. And, as the plaintiff advocates, the court has found that Insuring Agreement I.A(2) of the policy governs the plaintiff's obligations to Henderson with respect to his criminal proceeding. The stipulation does not contain a provision that governs the situation where just one of the Individual Defendants is convicted. The court cannot presume that the parties intended for the other Individual Defendant, who was not convicted, to receive only up to $50,000, where the stipulation is silent on this possible scenario.

The court concludes that, regardless of whether Strelish reimburses the plaintiff all or none of the $50,000 owed, the plaintiff is nevertheless obligated to pay Henderson Defense Expenses up to the Limit of Liability of $100,000 per the insurance contract. The plaintiff insurer fails to cite any case law supporting the proposition that it is entitled to a setoff from Henderson's claim for its payments towards Strelish's claim. Further, the court is not aware of any authority holding as such. The result of the court's ruling may be that the plaintiff insurer will have to pursue reimbursement from Strelish, and in the meantime continue to pay Defense Expenses to Henderson, such that the plaintiff's payments at one point in time may exceed the $100,000 limit of liability for each claim and for all claims under Insuring Agreement I.A(2). The

27

alternative would be that Henderson would not receive the $100,000 coverage to which he is entitled under the insurance contract. Regrettably, one party has to bear the risk of Strelish's default on the reimbursement he now owes the plaintiff, and the court concludes that this party should not be Henderson. The plaintiff, armed with all the resources of an insurance company, is in better shoes to bear that risk.

### C. Counterclaims for Bad Faith & Breach of Contract

With respect to Henderson's counterclaim for bad faith, the plaintiff argues that the counterclaim should be dismissed because the plaintiff's position is grounded in a reasonable basis. The Third Circuit has defined bad faith as "any frivolous or unfounded refusal to pay proceeds of a policy." Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir.2005) (quoting Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994)). To succeed on a bad faith claim, a plaintiff must demonstrate "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Verdetto v. State Farm Fire & Cas. Co., 837 F. Supp. 2d 480, 484 (M.D. Pa. 2011) aff'd, 2013 WL 175175 (3d Cir. Jan. 17, 2013) (quoting Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir.1997)). Courts have held that the plaintiff's burden is elevated at the

summary judgment stage. Verdetto, 837 F. Supp. 2d at 484. A plaintiff must demonstrate bad faith by clear and convincing evidence. Id.

The insurer did not deny Henderson's claim outright but contended that Insuring Agreement I.A(2) rather than I.A(1) applied, and even tendered insurance payments to defendant Henderson to go towards Defense Expenses under the former insuring agreement. As explained above, Henderson's position that he should receive the greater coverage under Insuring Agreement I.A(1) lacks merit. The Commonwealth did not seek restitution as a condition of Strelish's Plea Agreement and would unlikely seek restitution if Henderson were later convicted. More important, even if Henderson's criminal proceeding were later determined to seek restitution, allowing greater coverage to the Henderson on this basis would contravene Pennsylvania public policy, which precludes coverage for restitution arising out of criminal acts. Henderson cannot make out the first element of a bad faith claim, that "the insurer lacked a reasonable basis for denying benefits." Id. Therefore, the plaintiff's motion for summary judgment will be granted with respect to Henderson's counterclaim for bad faith, and Henderson's cross-motion for summary judgment will be denied in this respect.

With regards to LCTA's counterclaim for breach of contract, the plaintiff argues that the counterclaim must be dismissed with prejudice because the plaintiff did not breach any terms of the insurance contract. "To sustain a

breach of contract claim under Pennsylvania law, a plaintiff must prove: (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) resultant damages." Wagner v. Tuscarora School Dist., 2006 WL 167731, *13 (M.D. Pa. Jan. 20, 2006) (citing J. F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269, 1272 (Pa. Super. 2002)). "The insured bears the [initial] burden of proving facts that bring its claim within the policy's affirmative grant of coverage.'" Sciolla v. West Bend Mut. Ins. Co., 2013 WL 6671488, at *3 (Dec. 18, 2013 E.D. Pa.) (quoting Koppers Co., Inc., v. Aetna Cas. & Ins. Co., 98 F.3d 1440, 1446 (3d Cir. 1996)). However, where an insurer defends itself on the grounds that a policy exclusion applies, the burden shifts to the insurer to prove the applicability of exclusions or limitations on coverage. Sciolla, 2013 WL 6671488, at *3 (citing Koppers, 98 F.3d at 1446).

LCTA failed to respond to the plaintiff's motion on LCTA's counterclaim for breach of contract, and therefore LCTA has failed to satisfy its initial burden of proving that the plaintiff owes Henderson coverage under Insuring Agreement I.A(1). Further, in light of the court's rulings above, it cannot be said that the plaintiff has breached any duty to LCTA. The plaintiff's motion for summary judgment will therefore be granted with respect to LCTA's counterclaim for breach of contract

.

## IV.   CONCLUSION

Finding that no genuine issues of material fact remain as to the scope of the plaintiff insurer's obligations under the insurance contract, the court will grant the plaintiff's motion for summary judgment in part, and deny the motion in part. The court will also deny defendant Henderson's cross-motion for summary judgment, and the court will hold that defendant Strelish's cross-motion for summary judgment is also denied. Insuring Agreement I.A(2) governs the plaintiff's obligations towards Henderson in his criminal proceeding. In addition, Henderson has failed to carry his burden of demonstrating that the plaintiff insurance company acted in bad faith. Finally, Defendant LCTA has also failed to carry its burden of demonstrating that the plaintiff breached the insurance contract. An appropriate order shall follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: March 30, 2016**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-2417-01 -- VERSION 2.wpd

31